## McFarland et al. *vs.* The State Bank.

Under the decision of the Supreme Court of the United States, in *Briscoe* vs. *The Commonwealth Bank of Kentucky*, 11 *Peters*, 257, by which in this case this Court is bound, whatever may be its opinion to the contrary, Held, that the notes issued by the Bank of the State of Arkansas are not *bills of credit*, within the meaning of the Federal Constitution, and that the act incorporating the Bank is constitutional.

A plea of *non est factum*, not sworn to, in an action on *a* bond, is a nullity, and will be stricken from the files, on motion.

A plea of usury must allege a *corrupt agreement*, or it is defective on demurrer.

If a defendant would object that a Bank cannot discount bonds, he must do it by plea, showing the facts.

Remittitur of part of the interest adjudged, allowed to be entered in this Court.

THIS was an action of debt, tried in June, 1841, in the Circuit Court of Independence county, before the Hon. THOMAS JOHNSON, one of the Circuit Judges. The Bank of the State sued upon a bond for $255, executed to her by one defendant as principal, and the others as securities, jointly and severally, payable at the Branch at Batesville.

The defendants pleaded, *First*, *non est factum*, not sworn to; *Second*, that the bond was executed for a loan of notes of the Bank, which notes were bills of credit, and unconstitutional; *Third*, a plea of usury, omitting the allegation of *corrupt agreement*. Demurrers to the second and third pleas were sustained, and the plaintiff took judgment for the debt, and interest at the rate of ten per centum per annum, disregarding the first plea. The defendants sued a writ of error.

*W. Byers* and *Linton*, for the plaintiffs.

The second plea is good in form. *Commonwealth Bank of Kentucky vs. Clark et al.*, *Missouri Pamph. R.*, *A. T.* 1835, *p* 59; and *Byrne vs. The State of Miss.* 8 *Pet. R.* 40.

By the Act of 1836, incorporating the Bank of the State of Arkansas, the capital is raised upon the faith and credit of the State, and becomes the property of the State; its officers are elected by the Legislature; all the funds of the State, held for specific purposes, are deposited in it and become a part of its capital; the profits of the Bank enure the benefit of the State; its losses are sustained by it; its entire

management is under the control of the State, and for its benefit, through officers elected by her General Assembly. And as it is an established principle, that *qui facit per alium, facit per se,* it follows that the bills issued by the Bank were emitted by the State. *Craig et al. vs. The State of Missouri,* 4 *Peters Rep.* 332.

If the bills are in effect emitted by the State, then they are bills of credit, within the meaning of *Art.* 1, *sec.* 10, *Const. United States.* We are aware that the decisions of the Supreme Court of the United States upon this point are in conflict; and that the case of *Briscoe vs. The Commonwealth Bank of Kentucky,* 11 *Peters,* 257, which is the latest, is against us; but we refer the Court to the cases of *Craig et al. The State of Missouri,* 4 *Peters Rep.* 432; *The Commonwealth Bank of Kentucky, vs. Clark et al., Pamph. Rep., A. T.* 1835, *p.* 59; *Byrne vs. The State of Missouri,* 8 *Peters Rep.* 410; and the unanswerable argument in the opinion of Justice STORY, in the case of *Briscoe vs. The Commonwealth Bank of Kentucky,* 11 *Peters,* 257.

The demurrer to the third plea assigns for cause that the plea does not allege that the contract was *corruptly* entered into. The plea is as broad as the statute. *Rev. St. Ark., ch.* 80, *sec.* 7, *p.* 470. It is sufficient to plead in the language of the statute. 2 *Pet. Rep.* 537.

The first was a plea of *non est factum,* and is a good plea under the statute, and puts the same facts in issue as if sworn to, except the execution of the instrument. *Bates vs. Hintan, Misso. Pamph Rep., June Term,* 1835, *p.* 78; *Payne vs. Snell, Misso. Pamph. Rep., Oct. Term,* 1835, *p.* 238; *Rep. St. Ark.,* title "*Practice at Law,*" *sec.* 102, *p.* 633.

A bad plea is a sufficient answer to a bad declaration; and if the plea is demurred to, the Court will look back into the declaration, and give judgment against him who commits the first error. *Gould on Pleading,* 474, 475.

The declaration is not sufficient.

1st. Because it does not set out the authority of the Bank to sue.

2d. It does not set out the writing obligatory according to its legal effect.

3d. There is a material variance between the writing described in the declaration, and the one given on oyer.

4th. The writing sued on was payable in Bank; and there is no averment in the declaration of protest, and notice to the securities.

5th. The charter does not authorize the Bank to deal in writings obligatory; and the declaration does not aver that the obligation had become due and payable.

The first objection to the declaration raises the question whether the act incorporating the Bank of the State of Arkansas, is a public or private, a general or special law. If a private or special statute, it is necessary that the act should be pleaded authorizing the Bank to sue. The State becoming a partner in a trading company, divests itself, as concerns the company, of its sovereign character. *The Bank of the United States vs. The Planters' Bank*, 9 *Wheaton*, 904. If a private law, the Court is not bound *ex officio* to take notice of it. 6 *Bac. Abr.* 374.

2d. The declaration does not set out the obligation according to its legal effect, because it alleges generally that the defendants promised to pay, and does not describe them as principal and security, according to the obligation given on oyer. The terms principal and security have a definite and fixed legal meaning; and the latter binds himself to pay only in the event that his principal fails and he is notified of the non-payment.

Where the contract does not show that a part of the obligors were securities, they may plead the fact, and avail themselves of their rights as such: where the contract shows it, the holders of the bond and the Court must take notice of the fact. 10 *Peters Rep.* 257. The contract of the security must be construed strictly. *Miller vs. Stewart et al.* 9 *Wheaton*, 680. If an instrument be declared upon according to its legal effect, that effect must be truly stated; and the words of the contract stated in the declaration, must have the same legal construction as they would have in the contract itself. *Sheehy vs. Mandeville*, 7 *Cranch*, 208. *Ferguson vs. Harwood*, 7 *Cranch*, 413. 3 *P. C. R.* 394. The Legislature has declared that the remedy on obligations payable in Bank, shall be governed by the rules of the law-merchant, as to days of grace, protest, and notice. *Rev. St.*, *ch.* 20, *sec.* 14. The securities, before their liability is complete, must be notified of the non-

McFarland et al. *vs.* The State Bank.

payment by the principal. 1 *Pet. Rep.* 101. 2 *Pet. Con. Rep.* 66, and cases cited.

3d. If the promise is declared upon as absolute, and it be conditional, to pay if the principal does not, the variance is fatal. 1 *Pet. Con. Rep.* 312. If the undertaking be special, it must be so stated, or the variance is fatal. *Pope et al. vs. Barret,* 1 *Mass. Rep.* 117. *Smith vs. Baker,* 3 *Day's Rep.* 312. Accommodation paper is placed on the same footing as business paper; and a security or endorser's contract must be construed strictly and according to its legal effect, and so declared on. *Walker's Int. to American Law,* 421, 425, 431. 4 *Cranch,* 141.

4th. The writing obligatory given on oyer was payable in Bank; and there is no averment in the declaration of demand, protest, and notice. The *Rev. St., ch.* 20, *sec.* 14, *p.* 151, declares that writings obligatory, payable in Bank, shall be governed by the rules of the law-merchant, as to days of grace, protest, and notice. It was necessary, then, to aver in the declaration and prove on the trial, to fix the liability of the securities, a demand at the place where payable, on the day when payable according to the law-merchant, protest for non-payment, and notice to the securities. 3 *Kent's Com.* 44, 54, 65, 66, 67, 72, 75, 77, 79. *Bank of Columbia vs. Lawrence,* 1 *Pet. Rep.* 578.

5th. A corporation can exercise no powers except those conferred on it by law. 4 *Peters Rep.* 152. 13 *Pet. Rep.* 519. 2 *Cranch,* 127. 4 *Wheat.* 636. By the 6th section of the Charter, the Bank is authorized to deal in bullion, gold and silver coin, promissory notes, mortgages, bills of exchange, public stock, or any other collateral security that may appear expedient to the President and Directors. The right to deal in writings obligatory is not within the grant of her powers, nor is it necessary to carry into effect her banking privileges. A corporation cannot deal in any other matter, or in any other manner, than prescribed by the charter; and if she does so deal, the instrument no more creates a contract, than if the institution had never been incorporated. 2 *Kent's Com.* 226. *Head & Amroy vs. The Prov. Ins. Company,* 2 *Cranch,* 127. *The People vs. Utica Ins. Company,* 15 *J. R.* 358. 2 *Kent's Com.* 240. *Dartmouth College vs. Woodward,* 4 *Wheat.* 593. *Gazzler vs. The Corporation of Georgetown,* 6 *Wheat.*

593.   *The Bank of U. S. vs. Dandridge et al.* 6 *Pet. Cond. Rep.* 444. *Head & Amroy vs. Prov. Ins. Company*, 1 *Pet. Cond. Rep.* 375. *Beaty vs. Knowlton*, 4 *Peters*, 168.

The Court below erred in giving judgment for ten per cent. interest from the day the obligation became due; no rate of interest being specified in the contract, nor any averment in the declaration claiming that interest.   By the general law, the defendant in error was entitled to only 6 per cent. interest; and if entitled to more, she was bound to aver that fact, so that the plaintiff might have taken issue upon it.   The Court cannot give judgment for more than is demanded.   *Com. Dig., Title Pleader, p.* 369.   *Wooster vs. Clark*, 2 *Ark. Rep.*

*Hempstead* and *Johnson*, contra.

*By the Court*, LACY, J.

The facts stated in the record present, at the outset, the question of the constitutionality of the act of the Legislature incorporating the Bank of the State of Arkansas.   On the part of the plaintiffs in error, it is contended that this law is repugnant to that clause of the Constitution of the United States, which declares that " no State shall emit bills of credit."   For the defendant, it is said, that the issues of the Bank paper are not bills of credit, within the meaning of the Constitution, and therefore they are not included within its prohibition.   The meaning of the term " bill of credit" has been defined and settled by the Supreme Court of the United States.   We regret to be compelled to add, that a different interpretation has been given to the term, by that distinguished tribunal, upon two separate occasions, and that wholly dissimilar and contradictory principles have been deduced from their exposition.   The question was first brought before that Court, upon error, in the case of *Craig et al. vs. The State of Missouri,* reported in 4 *Peters*, 330; and the Court, in laying down the doctrine upon the subject, hold that the term " bills of credit," in their enlarged and perhaps literal sense, comprehends any instrument by which a State engages to pay money at a future day.   It is conceded on all hands, that the clause in question was inserted in the Constitution for the purpose of preventing the State governments from creating a paper

medium to circulate as money.   The excessive issues of such a currency, both by the Colonies and Continental Congress, prior to and during the time of our revolutionary struggle, was the mischief intended to be remedied.   And it may be remarked, that it is among the most extraordinary and memorable events recorded in history, that we should have been able to have achieved our national independence amidst a worthless and depreciated paper currency, and that the wide spread and deep ruin that followed from this state of things, was one of the principal causes that led to the formation and adoption of the Federal Constitution.

It is said that the language of the instrument itself, as well as the mischief designed to be remedied, restricts the term " bill of credit," and makes it signify a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society; and that the prohibition was inserted to cut up by the roots the emission of paper money by State governments.   That the word " emit" conveys to the mind the idea of issuing paper, intended to circulate as money, redeemable at a future day; and that, therefore, the objection that this definition would include all kinds of issues or engagements, by which a State contracts a loan on her credt, or in anticipation of a revenue, or agrees to pay money for services actually rendered, is not well founded.   In such cases, it is said, that a *bona fide* engagement to borrow money upon the faith of the State, or to pay it on a valuable consideration rendered by services, is a wholly different and distinct thing from issuing a paper currency to circulate as money; that the Constitution itself forbids the conclusion, that making bills of credit a tender in payment of debt, constitutes an essential quality of such paper emissions: that the same clause of the instrument that interdicts a State in emitting bills of credit, enacts that nothing but gold and silver shall be made a lawful tender in payment of debts.   To say that paper issues are not bills of credit, unless by the act creating them they are made a tender, is in effect to expunge this latter distinct and independent prohibition: that while tender laws, enforcing their reception, was one and probably the greatest evil intended to be remedied, still there were others, that fully justified the constitutional enactment, and they are embraced in its provisions; and

7

that this position was proven by the history of the times; for bills of credit were first made a tender by an act of the Virginia Legislature, in 1777, and that in the year 1781, she enforced as a tender, by statutory regulations, the legality of the paper emissions of the continental Congress. That both prior to those periods and subsequent to them, there were large amounts of paper money issued, without being made a tender; and that they were all redeemable upon a real or supposed fund, provided for that purpose; and some made payable on demand, in gold and silver. Still, these issues were ever held to be bills of credit; and that this is the case, whether issued directly in the name of the State, or indirectly by her authority, and whether with or without a fund for their redemption, the State being the sole and legal owner of such issues.

The application of these principles induced the Court to declare the law of Missouri, creating loan office certificates, to be unconstitutional and void. These certificates were issued in the name and by the authority of the State; a fund was provided for their redemption; and they were made receivable for all public dues, and in payment of the charges of the State. They were signed by the Auditor and Treasurer, and were issued in notes from ten dollars to fifty cents. The Court considered and determined that they were bills of credit, in the proper constitutional sense of that term; for they were issued by a State, as negotiable paper, designed to pass as a currency, and to circulate as money. When the case of *Craig et al. vs. The State of Missouri* was decided, in 1830, there were only seven Judges upon the bench. Four concurred in the opinion which Chief Justice MARSHALL then delivered; and three denied the doctrine then laid down and settled, and each of them delivered a separate opinion against its authority.

The same question was again brought up, on error to a judgment of the Court of Appeals of Kentucky, in the case of *Briscoe vs. The Commonwealth Bank* of that State. The writ was sued out about the year 1832, and the cause removed to the Supreme Court. When it came on first to be heard, Judge STORY remarks, that it was the opinion of a majority of that Court, that the act of Kentucky establishing the Commonwealth Bank was unconstitutional and void, being

repugnant to that clause in the Constitution which forbids a State to emit bills of credit. From some cause or other, the opinion was held up, and the cause was ordered to be re-argued, and was finally settled, at the January Term, 1838, in favor of the constitutionality of the act of the Kentucky Legislature. Before the opinion was delivered in this cause, the number of the Judges of the Supreme Court had been increased, by an act of Congress, to nine members; and death had removed several of those from the scene of their usefulness and great labors, who heard and determined the point in the case of *Craig et al. vs. The State of Missouri;* and among these was Chief Justice MAR- SHALL, a name ever to be held in respect and reverence. The opinion in the case of *Briscoe vs. The Commonwealth Bank of Kentucky,* was delivered by Justice McLEAN, and all the Judges then present, except Justice STORY, seem to have concurred in the reasons and principles stated. He dissented, and, in an argument of singular ability and learning, nobly vindicated the memory of his illustrious friend, the late and lamented Chief Justice, from the imputation of rashness or a want of deep reflection.

The case of the Commonwealth Bank, reported 11 *Peters,* 311, is attempted to be distinguished from, and taken out of the rule insisted on in *Craig et al. vs. The State of Missouri.* But, like Justice Story, we believe that the two cases stand precisely on the same ground, and turn expressly upon the same principle. If the first decision was right, the latter must be wrong; and the reverse of the proposition is equally true. The principal grounds stated and relied on to uphold the judgment in the latter, are as follows: That the definition given by a majority of the Judges, in the first case, of the term " bills of credit," is too general, as it would embrace every description of paper that circulates as money: That a bill of credit is what it truly purports to be, resting merely on the credit of the drawer, in contradistinction from a paper medium with a fund for its redemption: That the usual quality of such a bill, within the meaning of the Constitution, is that it must be issued by a State directly, and its circulation enforced by law: That the definition which includes all classes of paper emissions by the Colonies or the Continental Congress, is a paper issued by a sovereign power, containing a pledge of its faith, and designed to

circulate as money: That if a State is prohibited by the Constitution from doing by indirection that which she cannot do directly, (and as this is an incontrovertible principle), then it necessarily follows, according to the doctrine laid down in *Craig et al. vs. The State of Missouri,* that a State has no right to borrow money to pay for servics actually performed, or to incorporate private banking companies; for all these instruments, being bills of credit, are included in the prohibition: That such a construction would rob her of sovereignty, by cutting off at once her revenues and the means of improvement and security, and would place her powers absolutely under the control of the General Government, by the mere declaration and interdiction of paper issues; for the object of the Convention was to prevent the issue of paper money by State governments, without any fund to redeem it; and to constitute such emissions, the State must authorize the issues on her own credit and in her own name: the agents who act in the management of the corporation, must be capable of binding her in her sovereign character: That, as private banks existed at and before the adoption of the Constitution, they were not included in the prohibition: That to make the constitutionality or unconstitutionality of an act depend upon the amount of the interest that the State has in the incorporation, is to fix a fluctuating and ever varying rule in the construction of that instrument: That the State has the right to incorporate private banks; and this principle being conceded, then may she make herself a stockholder in the incorporation. If it be allowed her to become part owner in a corporation, why may she not be the entire stockholder? at what point is her interest to stop? When she mixes her own credit and capital with that of private individuals, she divests herself of all her sovereign attributes, and partakes of the character of other corporators, and has no more control over the affairs of the corporation than others, or only to the extent fixed by the charter.

These positions and principles led the Court to sustain the constitutionality of the act establishing the Commonwealth Bank of Kentucky. The statute created the President and Directors a corporation, made them elective by the Legislature, and gave them full power and authority to issue bank notes, and to do and perform the usual acts belonging to such corporation. It provided a fund for the redemption

of the notes, and made their issues receivable for taxes. The funds of the Bank were responsible for its liabilities; and, although the State was the entire owner of the Bank, and had unlimited control, through the agency of her Legislature, of its affairs and its operation, still these things, in the opinion of the Court, did not make the Bank issues bills of credit, within the meaning of the Constitution. No two causes probably ever attracted more of public interest or attention, than the two celebrated cases we have been considering; and none ever were decided, in any tribunal, upon more mature deliberation and reflection. For sure, none ever involved higher principles of constitutional law acting upon the sovereignty and independence of the States.

The pleadings in the case now before the Court, unquestionably show, that if the Commonwealth Bank of Kentucky be constitutional, the act establishing the Bank of the State of Arkansas must be valid. The two Banks possess precisely the same essential qualities, and stand upon the same principle. The State, in both cases, is the entire stockholder, and has unlimited control over its affairs, through their Legislatures. Indeed, if there is any difference in the two cases, it is in favor of our own Bank. The Bank of the State is made, as well by the Constitution as by her Charter, the depository of the funds of the State; her capital is raised upon the faith of the State; and her notes made receivable for taxes. She is authorized to deal in bullion, gold and silver, and issue notes, bills, or drafts, of a certain denomination. The gross amount of her issues are not to exceed triple the amount of her capital. This enumeration of her powers and privileges brings the question, so far as the constitutionality of the act of incorporation is concerned, expressly within the principles of the decision of the Supreme Court of the United States.

We have stated the reasons and principles of these two celebrated cases at some length, so that the public and the profession of our State may be in possession of them. It now remains to be seen how far this Court is bound by the authority of the decision of *Briscoe vs. The Commonwealth Bank of Kentucky.* Whatever opinion may be entertained abstractedly of its truth or justice, one thing is clear, that the rule on the subject is finally and conclusively settled by the highest Court in the Union; and there is not the least probability that it will

be shaken or overturned in our time. We have repeatedly held, and that, too, on several important occasions, that the Judiciary is the final interpreter of the will of the Constitution, within its appropriate jurisdiction. This principle lies at the very foundation of our happy systems of government, and constitutes the only means by which their freedom and independence can be preserved for ourselves, and perpetuated for our posterity. A contrary doctrine, in our opinion, tends to anarchy and revolution; and it has been mainly owing to the want of an independent constitutional judiciary in other countries, that mankind have so often been induced to right themselves by force, instead of appealing the the peaceful protection of the laws against the abuses of arbitrary power. All the departments of the government are unquestionably entitled and compelled to judge of the Constitution for themselves; but, in doing so, they act under the obligations imposed in the instrument, and in the order of time pointed out by it. The Judiciary speaks last upon the subject; and when it has once spoken, if the acts of the other two departments be unauthorized or despotic, in violation of the Constitution or the vested rights of the citizen, they cease to be operative or binding. The entire systems of our Federal and State Judiciary are intended to act in perfect harmony with each other; and thus these respective governments and the people have a double security for their rights and liberties. The Supreme Court of the United States constitutes the national forum of the last resort, upon all questions involving the construction of the Constitution of the General Government, the acts of Congress, and foreign treaties made in pursuance of its authority. Their decisions and opinions in these cases are final, and must be imperative upon all the State Courts. This must be so in the nature and necessity of things, or there would be no sovereign power, under our forms of government, to prescribe a rule of action possessing uniformity, consistency, and supremacy, which is indispensably necessary to the security of life, liberty, and property, and the pursuit of happiness. We hold ourselves as much bound by the decisions of the Supreme Court of the United States, on these questions, as we do our own State Courts bound by our judgments.

Entertaining these views, and being deeply impressed with their truth and importance, it is with the utmost cheerfulness, and in good

McFarland et al. *vs.* The State Bank.

faith, that we conform our opinion, in the case now before us, to the rule laid down and established in the case of *Briscoe vs. The Commonwealth Bank of Kentucky;* and we therefore declare the law incorporating the Bank of the State of Arkansas, to be constitutional.

Having disposed of this question, we will turn our attention to the other points relied on by the plaintiffs in error to reverse the judgment below.

There is no error in the Court below, in treating the plea of *non est factum* as a nullity. The plea was not sworn to, as the statute in such cases requires, and therefore ought to have been stricken from the rolls.

The defendants' plea of usury is fatally defective. It does not allege that there was a corrupt agreement to take more interest than the law allows. The corrupt agreement is of the essence of a usurious contract, which is nothing more than taking more interest than allowed by law. It must be averred and proved, to support the defence, as the authorities in the brief decidedly show.

The objection, that the Bank has no power to take writings obligatory in payment of her debts, we do not think tenable, in the aspect that the case now presents. Under a certain state of facts, it may and probably does possess such authority. We are unable to say upon what consideration the writing obligatory in the record was given. The presumption is, that the Bank acted in conformity with the charter; and if that was not the case, it was the duty of the party below to make that fact appear. His failing to do so, leaves the presumption to stand against him, and of course there is no error upon this point.

The error, if any, in giving judgment for ten per cent. interest from the date of protest, has been corrected by the remittitur entered of record in this Court.

Judgment affirmed.